FRED JUNG, Plaintiff-Appellee, v. HARRY ZEMEL, Defendant-Appellant (Kwang Mun, Defendant).

First District (4th Division)   No. 1—87—1689

Opinion filed September 21, 1989.

Lester Shapiro, of Zemel & Shapiro, of Chicago, for appellant.

Allen Weissman, of Chicago, for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Fred Jung, brought an action in forcible entry and detainer for possession of commercial premises in a building that he owns. His lessee, Harry Zemel, had used the premises for his dry cleaning business for several years. Zemel had entered a written agreement with Kwang Mun under which Mun was designated "manager" of the business. Jung sued both Zemel and Mun on the grounds that the agreement between Zemel and Mun was actually a sublease and that Zemel's failure to obtain Jung's prior written consent to Mun's subtenancy constituted a violation of the lease. The trial court found in favor of Jung.

On appeal, Zemel contends that his agreement with Mun was not a sublease; that even if it could be so construed, Jung waived any objection he had to Mun's tenancy; and that he did not receive proper notice of the termination of his leasehold.

We reverse.

BACKGROUND

The evidence adduced at trial reveals the following.

In 1977, Zemel entered into a lease with a prior owner, Marco Fernandez. He improved the premises to accommodate his dry cleaning store, putting in tiles, panelling, an electrical system, and fixtures at his own expense. Under the original lease, and renewal options, Zemel remained in possession as lessee from 1978 through 1984. During this period Jung purchased the building and became Zemel's lessor.

Jung and Zemel agreed to continue the leasing arrangement upon the expiration of the original lease in 1984, and they entered into a new lease with a higher rent but essentially the same terms. Zemel also paid Jung $10,000, the purpose of which is not clear in the record, although it was characterized as "back rent" and "unpaid gas and heat." The new lease was dated January 1985 and Zemel continued paying rent under this lease through the time of trial.

After Zemel had finished remodeling the premises in early 1978 he hired a Spanish woman to run the business. Fernandez, the prior lessor, was aware that this woman was operating the business but he

never discussed her with Zemel or asked Zemel about the operation of the store.

In April 1981 Zemel entered into an agreement with Kwang Mun. Zemel wrote the agreement in longhand and both parties signed it. Under the terms of the document, Mun was to manage the cleaners for a three-year period. The hours of operation were set out. All profits were to remain with Mun and she was to pay all expenses. In return, Zemel was to receive $75 per month "as a return on Zemel's investment." Zemel retained the power to designate the firm that would handle all dry cleaning and pressing. He retained title to the fixtures and granted Mun first option to buy if Zemel wanted to sell the store. The agreement contained a clause under which Mrs. Mun and her husband agreed not to compete with Zemel's business within a one-half-mile radius for two years following termination of the agreement. The agreement stated that Mun was not Zemel's employee.

Zemel did not give Jung a copy of this agreement, nor did he request Jung's consent to the arrangement he had with Mun. Zemel testified that he never intended to assign his lease. He also testified regarding the extent and nature of his control over the dry cleaning business.

According to Zemel, Jung learned of his agreement with Mun in late 1984, and he and Jung discussed it in December of that year. Zemel told Jung that with the rent increases and the $10,000 Jung had demanded, he was not making any profit from the store. The money that Mun was paying to Zemel for the rent expense was less than Zemel was obligated to pay to Jung.

Marcos Fernandez, the original lessor, testified that he never had any trouble with Zemel and that it made no difference to him who ran the store as long as the person was not drunk or breaking things. Zemel was the one who paid Fernandez the rent. Fernandez paid for the heat under the lease and never asked for water or gas.

Jung testified that he became the owner of the building in March 1978. He admitted that he visited the store several times a month and was aware that Mun occupied the store. He did not recall ever seeing Zemel in the store.

Jung stated that Mun showed him the agreement between her and Zemel in December 1984, when she discussed the fact that she and Zemel were negotiating for the sale of the business. According to Jung, the handwriting was so difficult to read that it took him awhile to transcribe it and understand its effect. He showed it to several people, including an attorney. He thought he became aware that it

was a sublease in February 1985. He then contacted Zemel, claiming that it violated their lease.

Jung testified that he told Zemel one way to cure the lease violation would be to consummate the sales negotiations with Mun. He, Zemel, Mun, and Mun's attorney discussed the sale during a meeting. Jung testified that he believed the negotiations were at an impasse in April 1985 and he sent a notice of termination of tenancy on May 1. He served the notice on Zemel by handing it to Mrs. Mun at the dry cleaners. He admitted that he knew Zemel's address in Highland Park, which was on the lease. After the expiration of the 30-day period, nothing happened.

Jung testified that he filed the forcible detainer action *pro se* on July 31, 1985. He had served five-day notices before and after filing the lawsuit.

In a letter dated January 4, 1986, months after the notice of termination and the institution of the lawsuit, Jung informed Zemel that he wanted the 6% rental increase that was called for in the 1985 lease.

Mun testified that she operates the cleaning business and pays rent to Zemel each month. She admitted that she showed Jung the agreement she had with Zemel in December of 1984. Zemel had asked her to buy the store and they were negotiating in January or February 1985. She said she paid Zemel all the rent that she owed him.

Zemel moved for directed finding at the close of Jung's case, which was denied.

Zemel called Jung to testify as an adverse witness, using Jung's deposition to impeach his trial testimony concerning when Mun contacted him about Zemel's request for the $10,000 and whether Jung had told Mun that he was going to end the lease with Zemel.

Jung admitted that he had told Zemel, in effect, that he wanted $9,000 to allow the sublease. However, Jung maintained that Mun was never formally offered to him as a sublessee.

Regarding the $10,000 payment that he received from Zemel, Jung testified that he received $4,500 in November 1984 and another $5,500 at the end of December. He said that the money was to pay for gas bills that he had not previously collected and for what he considered to be low rent in the past. He admitted that the "back rent" figure he came up with was not part of the rent in the lease, but merely what the rent should have been, according to his valuation of the lease. He also testified that he interpreted certain paragraphs in the lease as requiring the lessee to pay the gas and heat.

Zemel testified in his own behalf. He stated that when he and

Jung met to discuss renewing the lease in 1984, Jung wanted $10,000 as back rent and gas and heat. Zemel did not owe him any money and had paid the rent regularly and on time. His prior landlord had paid for heat because it was a centrally heated store.

Zemel contacted Mun and told her that since she was responsible for the expenses of the store she should pay him the $10,000 as reimbursement. Mun apparently complained to Jung, who then called Zemel and told him that he should not try to get the money from Mun. Jung told Zemel that he should sell Mun the store because that would take care of the lease violation.

Zemel testified that when he went to the meeting with Mun and her attorney to discuss the sale of the business, Jung was there and said he was "representing" her and looking out for her interests. Zemel told Mun's attorney that he would sell the store for $35,000, since he had already given Jung $10,000, leaving a net of $25,000. Jung said he thought that was too much and offered his opinion that $8,000 would be a fair price.

Zemel further testified that Jung telephoned him at home in February of 1985 and accused him of harassing Mun and of violating the Sherman Antitrust Act.

According to Zemel, in April 1986 Jung asked Zemel for $9,000 in exchange for his permission to transfer the lease to Mun. At that time the sales price had been negotiated to $22,500 and Mun's attorney had drawn up a contract with that amount. Zemel told Jung that if he gave him $9,000 he would end up with only $3,500 because of the previous $10,000 he had paid Jung to renew the lease.

Mun testified that although she signed the agreement that Zemel prepared she does not understand English. Her husband does, however, and he reviewed it.

At the close of the evidence the court ruled in favor of Jung, granting him possession of the premises. The court stated that "Mr. Zemel apparently viewed himself as operating the business and managing one of the cleaning establishments. That's what I ruled. He had a lease with the landlord, which was technical documents [sic], and I never did ask whatever he thought he was doing with Ms. Mun or any of the private people. *** [He entered into a sublease] and he never asked for consent until now. That's a violation of the terms of the lease."

OPINION

The ultimate issue in this forcible entry and detainer action is who is entitled to possession of the leased premises. Jung, the owner of

the building and lessor, bases his right to possession on the failure of his lessee, Zemel, to obtain his prior written consent before allowing Mun to occupy the premises. Zemel counters that he was not required to obtain Jung's approval of Mun because she was not a subtenant. Further, he maintains that Jung had no objection to Mun's tenancy and waived any objection to her by urging Zemel to sell the business to Mun. Since the law requires that a landlord may not withhold consent unreasonably, Jung's conduct was an improper restraint on the transfer of the leasehold.

■ Zemel initially asks this court to reverse the trial court's finding that his agreement with Mun constituted a sublease. He does not argue that the determination is against the manifest weight of the evidence, but instead argues that the trial court's construction of the agreement was erroneous as a matter of law. Additionally, he contends that the trial court was unduly influenced by a preliminary injunction order issued by a different judge in a separate, preliminary injunction action, which found the agreement in question to be a sublease.

While we acknowledge that Zemel retained certain indicia of control over the leased premises, and that he may not have intended to create a sublease, we also note that in substance the agreement could be construed as one. However, because we believe that the dispositive issue in this case is whether Jung waived the landlord consent provision, we will assume that the agreement between Zemel and Mun is a true sublease.

■ Since Zemel did not obtain Jung's prior, written consent to Mun's subtenancy, Zemel was in violation of the lease, as the trial court found. However, strict compliance with contractual provisions can be waived by the conduct of the parties. (See, *e.g.*, *Swerdlow v. Mallin* (1985), 131 Ill. App. 3d 900, 476 N.E.2d 464.) Moreover, Illinois law does not favor forfeitures, and courts have noted their readiness to find circumstances that indicate an intent to waive forfeiture. (See *Waukegan Times Theatre Corp. v. Conrad* (1945), 324 Ill. App. 622, 59 N.E.2d 308 (lessor who accepted rent from assignee was barred from asserting forfeiture based on a lease provision which stated premises could not be assigned without lessor's prior written consent).) In addition, covenants that restrict the assignment or subletting of leased premises are to be strictly construed against the lessor. See, *e.g.*, *Chanslor-Western Oil & Development Co. v. Metropolitan Sanitary District* (1970), 131 Ill. App. 2d 527, 266 N.E.2d 405.

■ In the pending case, the parties' dealings indicate that Jung

did not object to having Mun as a subtenant. On the contrary, he was willing to keep her as his main tenant under a new lease if Zemel sold her the business.

Jung, as successor to the prior landlord, purchased the building subject to Zemel's leasehold. During the several years remaining on the original and extended lease, Jung accepted the rent Zemel paid and apparently never requested additional money for heat and gas. Jung had seen Mun, not Zemel, in the store running the business. He voiced no objections to the way Zemel's business was operating and simply looked to Zemel for the rent.

Jung also was willing to renew Zemel's lease when the old one expired at the end of 1984. To this end, he and Zemel negotiated a lease to take effect in January 1985 with a higher rent and yearly increases. He also demanded that Zemel pay him a total of $10,000. He claimed $4,500 in "back rent," money that was not required under the original lease but which Jung apparently felt better reflected the value of the lease. He also claimed that he was due $5,500 for heat and gas that he believed was the lessee's obligation under the original lease, even though it had never before been requested or collected from Zemel.[1]

Although Jung admitted that he was shown the Zemel/Mun agreement in December 1984 (a time when he was entering the new lease with Zemel and collecting $10,000), he did not notify Zemel of the potential lease violation until February 1985. Even then, he participated in negotiations between Zemel and Mun for the sale of the dry cleaning business, telling Zemel the lease violation would be cured if the sale went through, provided that he received more money. That he did not find Mun an objectionable subtenant or even main tenant is clear from his words and acts. Under these circumstances, we do not find it appropriate to allow the forfeiture of the lease and the award of possession of the premises to Jung.

■ In Illinois, a landlord may not unreasonably withhold his consent to a commercially reasonable subtenant. See *Jack Frost Sales,*

---

[1]Although Zemel took the position at trial that he did not owe the $10,000 to Jung, he nonetheless paid it. He claimed that Jung otherwise would not have renewed the lease. Zemel then attempted to collect it from Mun under his agreement with her that she pay the "expenses" of the store. Not surprisingly, she balked at paying a $10,000 charge of which she had no knowledge or control. When Zemel explained what it was for and she then questioned Jung, he attempted to prevent Zemel from bothering Mun for the money. He even interceded in the sales negotiations that Mun and Zemel were conducting. This peculiar situation grew worse when Jung told Zemel that he wanted $9,000 if Mun purchased the business from Zemel.

*Inc. v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 933, 433 N.E.2d 941; *Vranas & Associates, Inc. v. Family Pride Finer Foods, Inc.* (1986), 147 Ill. App. 3d 995, 498 N.E.2d 333 (Commercially reasonable standards may include the financial responsibility of the proposed subtenant, the type of business to be conducted, and whether it competes with the business of the lessor or other tenants).

■ In the pending case Jung does not assert that Mun is an unacceptable tenant or that she has not shown herself to be financially responsible in operating the business. Rather, he maintains that Mun was never tendered to him as a subtenant. Ergo, he could not consent to that which was never offered.

In taking this simplistic approach Jung does not analyze the waiver issue but simply ignores it. Since under the law Jung could not have withheld his consent to Mun unless he had a reasonable basis for doing so, his attempt to terminate the lease is revealed for what it was—use of the technical lease violation in an attempt to force Zemel to pay him a substantial sum in exchange for permitting Mun's continued operation of the dry cleaners.

From the beginning of his lease in 1978 Zemel had others operate the dry cleaning business. He considered himself the owner of the business and the party responsible under the lease to perform the rental and other obligations owed to Jung. When he made his deal with Mun, in 1981, Zemel was not seeking a way out of his lease with Jung or planning to vacate the premises, as is often the case when the landlord's refusal to consent to a sublease is in issue. (See, *e.g.*, *Wohl v. Yelen* (1959), 22 Ill. App. 2d 455, 161 N.E.2d 339; *Scheinfeld v. Muntz TV, Inc.* (1966), 67 Ill. App. 2d 8, 214 N.E.2d 506.) As far as Jung was concerned, no change in the business occurred and no threat to his collection of rent arose. Jung was not required to find a new tenant to fulfill an unexpired term.

Nevertheless, several weeks after seeing a copy of the Zemel/Mun agreement, Jung took the position that because Zemel had not obtained Jung's consent to Mun's sublease, he could declare the lease forfeited at any time. Armed with that belief, he waited for months to do so, first telling Zemel to forget about getting the $10,000 from Mun and then telling him that the violation could be cured if Zemel sold Mun the business and paid him additional sums of money to permit the transfer. In the meantime, the business operated as usual, Jung continued to collect all rents due under the new lease, including demands for additional sums in heat and gas. Mun continued to run the store, as she had for years with Jung's awareness of her existence, if not legal status. The only thing that had changed was Jung's

perception of the arrangement between Zemel and Mun. His financial risk did not change. Once he decided that Mun was a subtenant, he apparently thought that he was entitled to profit from the situation, far beyond the terms of the lease or the expectations of the parties. Meanwhile, he continued to treat the 1985 lease as being in effect and he even sent a reminder in January 1986 that a percentage rent increase was due from Zemel. See *Waukegan Times Theatre Corp. v. Conrad* (1945), 324 Ill. App. 622, 632, 59 N.E.2d 308, 312 (Landlord "cannot be heard to say [lease] is valid for one purpose, and, in the same breath, that it is invalid for all other purposes").

We conclude that Jung's conduct constituted a waiver of strict compliance with the lease provision that required his prior consent to Mun's subtenancy. That he had no commercially reasonable objection to Mun's occupancy of the leased premises is evident from his dealings with Zemel and Mun in connection with the proposed sale of the business to Mun. Accordingly, we hold that the judgment granting Jung possession must be reversed and judgment entered in favor of Zemel.

Because of our holding, we need not reach the notice issue.

For the foregoing reasons, we reverse the judgment of the trial court.

Reversed.

JOHNSON and McMORROW, JJ., concur.