# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CT-00113-SCT

*HAROLD W. WRIGHT, HUGH G. PAYNE AND CURRY HOLLAND*

*v.*

*RUB-A-DUB CAR WASH, INC., KENT LANGDON AND HELEN LANGDON*

## <u>ON WRIT OF CERTIORARI</u>

| | |
|---|---|
| DATE OF JUDGMENT: | 01/08/97 |
| TRIAL JUDGE: | HON. WILLIAM L. GRIFFIN, JR. |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | HAROLD WILSON DUKE |
| ATTORNEY FOR APPELLEES: | WILLARD L. McILWAIN, JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 08/12/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: 09/02/1999 | |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Rub-A-Dub Car Wash, Inc., Kent Langdon and Helen Langdon brought an action in the Chancery Court of Washington County, alleging that they lost the sale of a car wash because the owners of the property, Harold W. Wright, Hugh G. Payne, and Curry Holland (hereinafter referred to collectively as WPH), upon which the car wash was located unreasonably refused to permit them to assign their lease of the land to the prospective purchasers. The Chancery Court found that the refusal was unreasonable and awarded Rub-A-Dub and the Langdons $50,000 in damages. WPH appealed. The Court of Appeals reversed and remanded as to the ownership of certain underground gasoline storage tanks, reversed and rendered as to the damages awarded, finding that Rub-A-Dub and the Langdons failed to prove the refusal to allow the assignment of the lease was unreasonable. The Court of Appeals also reversed and remanded on the owners' counterclaim. Rub-A-Dub and the Langdons filed a Petition for Writ of Certiorari which we granted.

## FACTS

¶2. Kent Langdon and Helen Langdon, the sole shareholders in Rub-A-Dub Car Wash, Inc., owned and

operated a business on land which was leased from WPH. One of the terms of the lease specified that Rub-A-Dub could not assign the lease without express written consent of WPH, which could not be unreasonably withheld.

¶3. The Langdons and Rub-A-Dub Car Wash, Inc. (hereinafter referred to as Rub-A-Dub), entered into a sales contract for the sale of the business for $85,000. WPH had concerns regarding leaking that may be occurring from some underground gasoline storage tanks located on the premises which had been installed by a previous tenant. WPH stated that it would agree to the assignment of the lease on the condition that either Rub-A-Dub or the prospective buyers, Mortimer and Stokes, agreed to assume all liability for the condition of the tanks and take whatever action was necessary to satisfy the state and federal EPA regarding the tanks, including removing them if so required. Neither Rub-A-Dub nor Mortimer and Stokes agreed to the conditions placed on the consent to the assignment by WPH, and the sale was never completed.

¶4. Rub-A-Dub brought an action in the Chancery Court of Washington County against WPH alleging that they had unreasonably withheld their consent to the assignment of the lease and requested that they be awarded damages for the loss of the sale of the business to Mortimer and Stokes. The case was submitted to the trial court on a stipulation of facts and exhibits, briefs submitted by each party, and proposed findings of fact and conclusions of law submitted by each party.

¶5. The trial court made the following findings of fact:

1. The chancellor has jurisdiction of the parties and the subject matter.

2. By Order of this Court, Kent Langdon and Helen Langdon were joined as Plaintiffs on July 25, 1996.

3. Defendants, at all relevant times hereto, were the owners of that certain real property located on Hwy. 82 East, Greenville, Mississippi, known as "Rub-A-Dub Car Wash".

4. On or about May 21, 1973, Defendants leased the property on Hwy. 82 East, Greenville, Mississippi to Harry Vickery (Vickery).

5. Vickery could not assign the lease without the consent of the Defendants, said consent not to be unreasonably withheld.

6. When Vickery leased the property, it was unimproved real estate.

7. Vickery installed a mechanical car wash known as "Rub-A-Dub Car Wash" and three underground gasoline tanks.

8. The Lease did not authorize or give permission to Vickery to install underground gasoline storage tanks, but Defendants had knowledge of the installation of the gas tanks and did not object.

9. On or about January 2, 1975, Vickery subleased the property to Kathleen I. Turner and David W. Turner (Turner).

10. Defendants consented to the assignment from Vickery to Turner.

11. On March 23, 1988, Defendants herein entered into a new Lease with Kathleen I. Turner and David W. Turner.

12. The Lease of March 23, 1988, provided that the Lease could not be assigned or sublet "without the express written consent of Lessors, which consent could not be unreasonably withheld."

13. On or about May 2, 1990, Kathleen I. Turner subleased the property to Plaintiff, Rub-A-Dub Car Wash, Inc., a Mississippi corporation.

14. Defendants consented to this assignment, but denied that they were the owners of the gasoline storage tanks located on the real property which was the subject of the lease.

15. Rub-A-Dub Car Wash, Inc. is a Mississippi Corporation. Helen Langdon is Vice-President and Charles Langdon is President. The Langdons are the only stockholders of the corporation.

16. On May 4, 1990, Rub-A-Dub Car Wash, Inc. purchased the business and all of the equipment of the Rub-A-Dub Car Wash "including all office equipment, including cash registers, chairs, air conditioning units, desks and all personal property **except gasoline storage tanks**." (Emphasis added by the [chancery] Court.)

17. The Bill of Sale from Kathleen Turner to the Plaintiffs acknowledged that the gasoline storage tanks had spillage and/or leakage.

18. The consideration for the May 4, 1990, transaction, which included the transfer of assets and the assignment of the lease, was $35,000.00. Defendants consented to this assignment.

19. Plaintiffs did not seek or obtain the permission from the Defendant owners of the property herein to continue to use the gasoline storage tanks.

20. Plaintiffs did not have the express permission from Defendants to utilize the gasoline storage tanks for the purposes of selling gasoline; however, there was never an objection from the Defendants to such use.

21. On or about August 24, 1994, and again on October 25, 1994, Plaintiff requested that Defendants agree to a sublease of the property herein.

22. On August 29, 1994, in response to a request that Defendants agree to an assignment of the lease, Defendants advised they would agree to an assignment of the Lease to Stokes and Mortimer but, "Specifically, Rub-A-Dub Car Wash, Inc. must agree to whatever is necessary to satisfy the state and/or federal EPA with regard to the underground gas storage tanks located on the premises. This would include removal or filling of the tanks with some suitable fill such as sand or whatever else the state and/or federal authorities would require in connection with the tanks. If Rub-A-Dub does not desire to do this, then, the Lessors will agree to the assignment to Mortimer and Stokes if Mortimer and Stokes will individually and personally agree to assume the responsibility for the existing conditions and present use of the underground storage gas tanks."

23. On September 28, 1994, Charles Langdon and Helen Langdon entered into a Sales Contract for the "Rub-A-Dub Car Wash" with Hilton Stokes and Robert Mortimer. The sales price was $85,000.

24. This Sales Contract did not provide for the right of the purchaser to use the underground gas storage tanks.

25. Charles and Helen Langdon had knowledge when they entered into the Sales Contract that the Defendants had reservations concerning the gas storage tanks.

26. Neither the Plaintiff nor Mortimer and Stokes would agree to the conditions placed by Defendants on the assignment.

27. Defendants now deny that they are the owners of the storage tanks.

¶6. Based on his findings of fact, the chancellor concluded the following:

The gasoline storage tanks and the liability attached to their ownership lies totally with Defendants. Vickery abandoned the tanks, as he did the building, and their value, or, as fate would have it, their liability, became the property of Defendants. Defendants enjoyed the benefits of the tanks without complaint from 1973 until 1994, when their consent to an assignment was requested. They should not, in equity, be allowed to use the request for their consent to an assignment as an opportunity to re-write the lease and thereby abdicate their responsibilities with regard to liability. That is exactly what they tried to do by their unreasonable requests, compliance with which requests were a condition precedent to their consent to the assignment.

The Court notes that if the same requests which were made to Plaintiff and to Mortimer and Stokes were part of the negotiations of a new lease, they might very well be reasonable. But under the facts now before the Court, they are unreasonable.

¶7. The chancellor awarded damages in the amount of $50,000 to Rub-A-Dub for the loss of the sale to Mortimer and Stokes. WPH appealed, and the case was assigned to the Court of Appeals, which reversed and remanded on the issue of ownership of the tanks concluding that the issue of ownership of the tanks was not before the trial court and that the trial court's findings were not supported by the record.

¶8. Regarding the award of $50,000, the Court of Appeals reversed and rendered finding that Rub-A-Dub had not met its burden of proof in showing WPH's refusal was unreasonable. Rub-A-Dub filed a Motion for Rehearing in the Court of Appeals which was denied. We subsequently granted certiorari to consider these issues:

**I. WHETHER OR NOT THE CHANCELLOR ERRED IN RULING THAT APPELLANTS WERE THE OWNERS OF THE UNDERGROUND GASOLINE STORAGE TANKS IN QUESTION AND THAT APPELLANTS WERE RESPONSIBLE FOR COMPLIANCE WITH THE MISSISSIPPI UNDERGROUND STORAGE TANK ACT.**

**II. WHETHER THE CHANCELLOR COMMITTED MANIFEST ERROR IN FINDING THAT THE PROPERTY OWNERS' REFUSAL TO CONSENT TO THE ASSIGNMENT OF THE LEASE WAS UNREASONABLY WITHHELD.**

**III. WHETHER OR NOT THE CHANCELLOR COMMITTED MANIFEST ERROR IN AWARDING DAMAGES TO APPELLEE FOR APPELLANTS' REFUSAL TO**

**CONSENT TO AN ASSIGNMENT.**

**IV. WHETHER OR NOT THE CHANCELLOR COMMITTED MANIFEST ERROR IN REFUSING TO AWARD A JUDGMENT ON APPELLANT'S CLAIM FOR TRESPASS FOR THE CONTINUED STORAGE OF GASOLINE BY APPELLEE IN THE UNDERGROUND GAS STORAGE TANKS.**

## ANALYSIS

### I and II

¶9. Rub-A-Dub argues that the Court of Appeals went outside the record and substituted its judgment for that of the chancellor who was in the best position to evaluate all of the factors. In support of its position, Rub-A-Dub cites only two cases, *Tucker v. Tucker*, 453 So.2d 1294 (Miss. 1983), and *Yates v. Yates*, 284 So.2d 46 (Miss. 1973), wherein the Court stated:

> "... we, as an appellate court, will affirm the decree if the record shows any ground upon which the decision may be justified ... We will not arbitrarily substitute our judgment for that of the chancellor who is in the best position to evaluate all factors relating to the best interests of the child." 284 So.2d at 47."

*Tucker,* 453 So.2d at 1296 (quoting *Yates v. Yates*, 284 So.2d 46, 47 (Miss. 1973).

¶10. Rub-A-Dub then goes on to argue that, under the facts of the case, the Court of Appeals erred in its findings. Specifically, it argues that there was ample evidence in the record to support the finding by the trial court that Vickery had abandoned the tanks. Rub-A-Dub further argues that this issue was never before the trial court and has no legal bearing on the case. On this issue, the Court of Appeals found:

> The primary issue presented to the chancellor was whether WPH unreasonably withheld their consent to the assignment of the lease. However, as the chancellor determined that underlying the "unreasonable" issue is who owns the tanks and who must be held accountable for any liability connected with the use of the tanks. The chancellor concluded that WPH owned the tanks. This Court, however, is unable to follow the trail of evidence that points to WPH having ownership.

Slip op. at 7-8 (Miss. Ct. App. Sept. 15, 1998).

¶11. After reviewing the evidence in the record, the Court of Appeals went on to hold:

> We are unable to determine ownership of the tanks based on the record before us. We agree with WPH that ownership was never an issue before the court. Thus, having not been an issue, the question of ownership could not have been properly litigated. Rub-A-Dub, Inc., argues that ownership has nothing to do with the reasonableness of WPH's request. We agree that ownership alone will not establish whether WPH's request was reasonable. We find it incumbent on Rub-A-Dub, Inc., the operators of the gasoline tanks, to show why it is not reasonable for WPH, whether they own the tanks or not, to be concerned about a possible leakage. Rub-A-Dub, Inc. did not carry that burden. The evidence indicates that the tanks at one time leaked. Whether they are leaking now remains to be seen.

. . . . . . . . . . . . . . . .

The record before us raises many questions that inhibit our ability to adequately review this case. We find that the chancellor's determination of ownership was not supported by substantial evidence; therefore, his decision was arbitrary and capricious. We believe that in the interest of equity the unanswered questions we have raised should be addressed before anyone can determine the liability for the tanks. As such, we must remand this case to the chancery court for additional proceedings to establish ownership of the tanks.

Slip op. at 9-11 (Miss. Ct. App., Sept. 15, 1998).

¶12. The Chancellor concluded that WPH was the owner of the tanks and totally liable, because Vickery, who installed them, abandoned the tanks in favor of WPH. The Court of Appeals held that the issue of ownership of the tanks was never properly before the Chancellor and stated that court was "unable to follow the trail of evidence that points to WPH having ownership." Slip Opinion, at 8. The Court of Appeals decision in referring to the Vickery lease of the property to the Turners, acknowledges that "we are not privy to the bill of sale between Vickery and the Turners." That court assumed that the sale excepted the gasoline tanks, by stating further, "Thus, we are still left with the question of who owns the gas tanks." Slip Opinion, at 8.

¶13. We acknowledge our common law general rule as set out in *Simmons v. Bank of Mississippi*, 593 So. 2d 40,42 (Miss. 1992) (*citing Stillman v. Hamer* 7 How. (8 Miss.) 421 (1843)), which stated that "whatever is affixed to the land becomes a part of the realty." *Id.* However, trade fixtures which are personal property are an exception to this general rule. The *Simmons* Court, in holding that the title to the building at issue resided with the lessee, stated that "lessor and lessee may agree among themselves regarding title to and removal of improvements and may reflect their wishes in formal agreements this Court will enforce." *Id.*

¶14. In the case at bar, both the lease by WPH to Vickery, which was later assigned to the Turners, and the new 1988 lease executed between WPH and the Turners contained the following clause:

It is understood and agreed between the parties that Lessee, in connection with the business or businesses he will conduct on the demised premises, will construct a building thereon and, from time to time during the primary and/or renewal terms, will install various items of machinery, equipment, appliances and fixtures therein; and it is further agreed that all such machinery, equipment, appliances and fixtures (no matter how attached to the realty) shall at all times remain and be the personal property of Lessee and Lessee shall have full right to remove same from the demised premises at the end of the primary and/or renewal terms.

¶15. As noted by the Court of Appeals, "Clearly, WPH, as lessors, never intended to become the owners of the gasoline tanks." Slip Opinion at 9. The lease was a ground lease only. WPH never profited, much less charged for the tanks or sale of gasoline, while notably all the lessees did so profit. That court also pointed to the bill of sale from the Turners to Rub-A-Dub which clearly acknowledged that WPH did not own the underground gasoline storage tanks. There was testimony by WPH that at that point in time they had become concerned about the tanks, thus they insisted on this language. And yet, the Turners conveyed all personal property to Rub-A-Dub Car Wash, Inc. "except gas storage tanks." More importantly, the Turners acknowledged in the bill of sale that the tanks had been tested, which said test results revealed

"chemicals around the subject tanks as reflected in the report from Southern Technical Services, Inc." Then the Turners in paragraph 11, held Rub-A-Dub harmless from any responsibility for environmental or legal problems or liabilities with the EPA or any other federal or state agency as a result of the **present conditions or past use of said tanks and storage systems**. (emphasis added). Finally, the Turners allowed Rub-A-Dub to continue "the right to use said storage tanks during the balance of the lease period."

¶16. While the question of ownership of the gasoline storage tanks was never specially pled by the parties and Rub-A-Dub argues it was never properly before the chancellor, nevertheless, the issue of ownership was discussed and argued by the parties before the chancellor. The chancellor found that ownership was "underlying" the primary issue of whether WPH's conditions placed on the sale were reasonable. We too conclude that ownership of the tanks may affect the issue of WPH's reasonableness concerning their actions toward Rub-A-Dub and its potential buyers for the sale of the property.

¶17. An argument could be made that WPH owned the tanks due to their knowledge that the tanks were installed by and ultimately abandoned by Vickery. On the other hand, as noted above, WPH always denied ownership of the tanks in all leases of this property and on one occasion had such language inserted into a bill of sale.

¶18. The Turners, it could be argued, may have locked themselves into ownership of the tanks in question in view of the terms of the new 1988 lease from WPH and their Bill of Sale to Rub-A-Dub Car Wash, Inc. And to further confuse the issue, we have allegations and documentation that Rub-A-Dub Car Wash when requesting the right to use the tanks, certified to the Mississippi Department of Environmental Quality that Rub-A-Dub Car Wash owned the tanks in question. The Court of Appeals noted, "We find it curious that Appellees claimed ownership of the tanks when they were attempting to get permission to use the tanks but throughout the proceedings in the court below, Rub-A-Dub Car Wash, Inc., maintained that it does not own the tanks." Slip Opinion, at 10.

¶19. Finally, we note that on February 9, 1998, the Court of Appeals denied a motion by WPH requesting a remand of the case because of newly discovered evidence concerning an EPA investigation of the premises in question as to contamination thereon and responsibility for actual contamination. The Court of Appeals apparently realized its error in denying the motion to remand due to newly discovered evidence, by acknowledging in its opinion, "After hearing the oral argument from each party and after considerable review of the record, we now realize further proceedings are necessary." Slip Opinion, at 10.

¶20. We thus agree with the Court of Appeals that this question of ownership and liabilities was not properly litigated and decided below. While it may appear at first glance that the issue of ownership has nothing to do with the primary question of the reasonableness of WPH's conditions for the sale, we find that it has everything to do with that ultimate issue before this Court.

¶21. WPH correctly cites to Miss. Code Ann. § 49-17-411 (Rev. 1990), which provides that "[n]o person shall own, install, or operate an underground storage tank without complying with the applicable regulations of the commission." WPH consistently claimed not to be the owner in all leases and extensions thereof and so argued at trial. If WPH are not the owners of the tanks, they cannot be held liable under the statute for any spill of chemicals or gasoline, because they clearly never installed or operated the tanks. Whether WPH are the owners of the tanks must be properly resolved, because being the owner of the tanks is the only way under the facts in this record that WPH may be held liable, which goes to the very heart of whether their conditions placed upon the sale of the property were reasonable.

¶22. WPH owns the real property in question. WPH was aware that the tanks had been placed upon the property by Vickery, Even Vickery, the installer of the tanks has exposure and possible liability under the statute for the tanks. WPH expressed concerns about leaking tanks to Rub-A-Dub prior to Rub-A-Dub's proposed sale to Mortimer and Stokes. Upon learning of the proposed sale, WPH conditioned approval of the sale on an either/or requirement - either Rub-A-Dub agree to satisfy the state and/or federal EPA as to the underground gas storage tanks, or the new owners must agree to assume the responsibility for existing conditions and present use of the underground storage gas tanks.

¶23. Vickery had installed the tanks and, according to the Chancellor, abandoned them, thus making them a part of the realty. WPH might be the owner under this theory. If WPH is in fact the owner of the tanks, then they can be held liable, therefore their refusal to consent to the lease was unreasonable in that it was an attempt to absolve themselves completely of liability.

¶24. The new l988 lease from WPH to the Turners clearly passed title to all personal property to them and specifically stated that WPH did not own the tanks. We find no reference to a Bill of Sale in the record, thus we do not know if the Turners purchased the tanks or not. We cannot assume anything regarding this issue, as did the Court of Appeals, due to the absence of such a document in the record. However, the Turners used the gasoline tanks, sold gasoline during their lease, and acknowledged a spill of chemicals had occurred prior to their sale to Rub-A-Dub Car Wash.

¶25. The Turner's Bill of Sale to Rub-A-Dub acknowledged that WPH did not own the tanks, and the Turners conveyed all personal property except the gas tanks. The Turners indemnified Rub-A-Dub as to liability but, allowed Rub-A-Dub to continue to use the tanks and sell gasoline. Rub-A-Dub thus did not receive ownership of the tanks, but continued operating the tanks by selling gasoline after notice they had leaked. Whether they leaked further is unknown. However, Rub-A-Dub claimed that it had proof that no current problems existed with chemicals around the tanks, but for some unexplained reason it failed to disclose such evidence during discovery and failed to offer proof at trial other than to merely claim there were no current problems with the tanks. Rub-A-Dub disavowed ownership of the tanks to its potential buyers who obviously planned to continue use of the tanks for the sale of gasoline on the premises, because the potential buyers backed out on the sale when WPH requested certain conditions of Rub-A-Dub and/or the purchasers. Ownership is thus material to the ultimate question of the issue of reasonableness of WPH's actions. We agree with the Court of Appeals' result and we therefore reverse and remand on this issue, albeit for a somewhat different reason.

### III. and IV.

¶26. Rub-A-Dub also argues that the Court of Appeals was incorrect in reversing and rendering the chancery court's $50,000 damage award. Rub-A-Dub cites no case law in support of its position, but instead argues that the Court of Appeals erred because there was no evidence of an on-going environmental problem with the property, or that Rub-A-Dub had done anything to cause the leak.

¶27. On this issue, the Court of Appeals found:

> On the reasonableness of the WPH's refusal to approve the assignment of the lease, we reverse and render this verdict regardless of the ultimate resolution of the ownership of the underground gasoline storage tanks. WPH, the owners of the property, at some point became aware of the existence of a

potential environmental hazard on their property in the form of underground gasoline storage tanks that were possibly leaking. That hazard had the potential to have a devastating effect on the value of the property, and the risk existed without regard to who actually held legal title to the tanks. In that situation, it was within the inherent authority of the owners to demand that Rub-A-Dub, Inc., as the lessee in possession of the property and the user of the tanks, undertake reasonable steps to remedy the situation. The owner of the property cannot be required to stand idly by and suffer the continuation of, and possible aggravation of, a condition that damages his property when that condition is brought on by the activities of the lessee. That is a classic example of a lessee committing waste, for which the law provides the owner a remedy. *See Sparkman v. Hardy*, 223 Miss. 452, 459, 78 So. 2d 584, 587 (1955).

In view of the existence of the owners' right to demand some resolution of this on-going problem of the present lessee, it does not seem unreasonable for the owners to take the occasion of the proposed lease transfer to bring the matter to a head.

The lease provision relating to assignments did not preclude the owners from attaching *any* conditions to the approval of a lease assignment. If that were the case, the right to withhold consent would be illusory. The plain meaning of the term in the lease is that any such conditions attached to approval of a transfer must be reasonable. It has been said, in the context of approving a proposed lease assignment, "the term 'reasonable' must refer to considerations of fairness and commercial reasonableness." *Stern's Gallery of Gifts, Inc. v. Corporate Property Investors, Inc.*, 337 S.E.2d 29, 36 (Ga. Ct. App. 1985). It is commercially reasonable that the owners in this case chose to withhold consent to an assignment of the lease until the present or proposed tenant formally agreed to assume responsibility for the proper operation of the business fixtures on the property, no matter who owned them -- an obligation that probably existed independently of a formal affirmation by the new tenant, but one which the owner could reasonably require to be explicitly acknowledged in order to avoid future misunderstandings. The fact that the proposed new lessee found this condition unacceptable does nothing to make it unreasonable. We reverse and render the case in favor of Appellants, WPH.

Slip op. at 11-12 (Miss. Ct. App. Sept. 15, 1998).

¶28. In *Sparkman v. Hardy,* 223 Miss. 452, 459, 78 So. 2d 584, 587 (1955), the Court stated:

In *Moss Point Lumber Co. v. Harrison County*, 89 Miss. 448, 42 So. 290, 300, 873, this Court said that: "Waste is defined to be any substantial injury done to the inheritance, by one having a limited estate, during the continuance of his estate." It was also there said that: "* * * it is a universal rule in this country that, unless exempted by the terms of the lease from responsibility for waste, a tenant is responsible for voluntary waste, whenever committed."

¶29. We find, under the facts of this case, that it would be a valid argument that it not be commercially unreasonable for WPH, the owners of the property, to take steps to assure that the tenants or proposed tenants operate and maintain the underground storage tanks so as not to commit waste, something the tenants would be responsible for absent an agreement to the contrary. Businesses engaged in the installation and/or ownership and/or operations of gasoline storage tanks and the ultimate sell of gasoline were not as aware or concerned in May of 1973 with EPA regulations or federal or state statutes concerning these storage tanks as compared to the late 1980's, when the regulations and governing statutes became much

more demanding as to liability and accountability for owners, installers, or operators of underground storage tanks. In the late 1980's, publicity concerning the regulations and statutes produced a heightened sense of awareness regarding underground tanks and potential liability among these three various groups referred to in the statute.

¶30. The chancellor noted that all parties involved in the case at bar disavowed ownership of the tanks. WPH simply states that the tanks have never belonged to them. The other parties are all singing the same verse from the same song, i.e., "these tanks do not belong to us, but rather to someone else, however we want to continue to use them and sell gasoline." All these other parties have been, currently are, or would have been operators of the tanks had the sale been finalized. Ownership, installation, or operation of the tanks are all factors which potentially liable any one or all of these parties, thus affect the commercial reasonableness standard.

¶31. Rub-A-Dub argues that there was no proof in the record that it was responsible for doing anything to cause the leakage of the tanks or for that matter that there was an on-going environmental problem. The record reflects otherwise. There had been a prior confirmed spill or leakage of the tanks. A current EPA investigation was apparently in process during the time of these proceedings. WPH's refusal was based on their concern that waste of the estate was being committed by the continued use of the underground storage tanks which had leaked and was possibly still leaking. Rub-A-Dub offered slim evidence to show that the tanks were not leaking, and its evidence was extremely slim showing why it was unreasonable for WPH to be concerned about a possible leakage of the tanks when clearly, if the tanks were leaking, waste of the estate was being committed. More importantly, Rub-A-Dub Car Wash claimed to have proof to refute that any problems concerning gasoline leaking currently existed, but wholly failed to reveal such proof during discovery or at trial.

¶32. The Langdons, owners of Rub-A-Dub Car Wash, Inc., also admitted during their depositions that WPH's request was reasonable and that they were merely "stupid" in not agreeing to the conditions proposed by WPH. The Chancellor found that they were "only laymen" and that their testimony had no effect whatsoever from a legal point of view. We cannot so conclude. The Langdons testified under oath at deposition. Their depositions were admitted as evidence. They both obviously recognized that WPH's request was not that unreasonable and they so stated. That testimony is unrefuted in the record. How could the Chancellor legitimately ignore the importance of their testimony? He should not have under the facts of this case. This Court has stated, "We as the appellate court will affirm the decree if the record shows any ground upon which the decision may be justified." *Tucker v. Tucker*, 453 So.2d 1294,1296 (Miss. 1983) (quoting *Yates v. Yates*, 284 So.2d 46, 47 (Miss. 1973). Rub-A-Dub's slim proof in this record is insufficient to support the chancellor's decision. The chancellor erred.

¶33. The Court of Appeals reversed and remanded for proceedings regarding the ownership of the tanks in question, but reversed and rendered on damages. The plaintiffs offer some slight evidence as to unreasonableness of WPH's actions, but it is insufficient to support the chancellor's opinion. Damages for loss of the sale of the property is the very heart of the issue for the plaintiffs. Why should the plaintiffs proceed with a new trial to determine only who owns the tanks if they cannot be awarded damages? The Court of Appeals erred for the reasons stated above.

¶34. We reverse and remand for a new trial on the issue of ownership of the tanks as the same relates to whether WPH's actions were commercially reasonable and damages for the plaintiff's loss of sale.

Regarding the counterclaim of WPH, since we are reversing and remanding for a new trial on other issues, we also reverse on the issue of the counterclaim and remand for a new trial on that issue as well.

## CONCLUSION

¶35. The issue of ownership of the underground storage tanks was never properly before the chancery court, and therefore could not have been properly litigated. Ownership of the tanks affects the primary issue of reasonableness of WPH's actions. The Chancellor ignored certain unrefuted testimony and failed to consider all the evidence submitted regarding the reasonableness of WPH's actions, and potential liability under the storage tank law, of all parties who either installed, owned or operated the tanks, thus the lower court's opinion is manifestly in error. The Court of Appeals was correct to reverse and remand on the issue of ownership, correct in reversing and remanding on the counterclaims, but erred in reversing and rendering damages. We affirm as to Issues I and IV, but reverse and remand as to Issues II and III.

¶36. Therefore, we affirm the Court of Appeals judgment in part, reverse the Court of Appeals judgment in part, and reverse the judgment of the Washington County ChanceryCourt. We also remand this case to the Washington County Chancery Court for further proceedings consistent with this opinion.

¶37. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER, C.J., MILLS, WALLER AND COBB, JJ., CONCUR. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN AND PITTMAN, P.JJ. McRAE, J., JOINS IN PART. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, P.J., AND BANKS, J.**

### BANKS, JUSTICE, DISSENTING:

¶38. I do not agree that it is reasonable for a lessor to withhold consent to an assignment of the lease, merely to force the lessees to enter a new lease agreement. Accordingly, I respectfully dissent.

¶39. A clause which prevents a lessee from assigning the lease without the consent of the lessor is included in a lease only to protect the lessor from incurring additional risk which may arise out of the assignment. The reasonableness of a lessor's failure to consent to an assignment of a lease should be judged in accordance with a commercial reasonableness standard. *Rowley v. City of Mobile*, 676 So. 2d 316, 318 (Ala. Civ. App. 1995); *Campbell v. Westdahl*, 715 P.2d 288, 292 (Ariz. Ct. App. 1985); *First American Bank of Nashville, NA. v. Woods*, 781 S.W.2d 588, 590 (Tenn. Ct. App. 1989). Commercially reasonable factors to be considered by a lessor in determining whether to consent to the assignment of a lease, may include:

> ... the financial responsibility of the proposed assignee or subtenant, whether the new tenant's use will require alteration of the premises, the legality of the proposed use, the nature of the occupancy, and the compatibility of the tenant's use with the uses of the other tenants in the same shopping center or office building.

*Rowley*, 676 So. 2d at 319 (quoting D. Thomas, 12 *Thompson on Real Property* § 97.06(c)(22)(ii) at 108 (1994)). It is reasonable for a lessor to withhold consent where there is a genuine question as to whether the assignment would compromise the lessor's current status under the lease. *Campbell*, 715 P.2d at 292-93; *Worcester-Tatnuck Square CVS, Inc. v. Kaplan*, 601 N.E.2d 485, 489 (Mass. App. Ct. 1992).

¶40. However, public policy is not served by allowing the lessor to withhold consent as a method of coercing the lessees to enter into an entirely new lease with increased financial benefit to the lessor. *Chrysler Capital Corp. v. Lavender*, 934 F.2d 290, 294 (11h Cir. 1991); *Campbell*, 715 P.2d at 292-93. It is unreasonable for a lessor to withhold consent to the assignment of a lease, where the lessor's refusal to consent is motivated by a desire to obtain an increased economic benefit. *Economy Rentals, Inc. v. Garcia*, 819 P.2d 1306, 1315-16 (N.M. 1991). *See also* *1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc.*, 485 A.2d 199, 209 (D.C. 1984) ("... a landlord may not for economic motives reasonably refuse consent to a sublease that fully protects the landlord's bargain under the prime lease."); *Jung v. Zemel*, 545 N.E.2d 242, 247 (Ill. App. Ct. 1989) (lessor had no commercially reasonable basis for refusing to consent to assignment where there was no change in lessor's financial risk and lessor merely wanted to increase profit under the lease);; *Worcester-Tatnuck Square CVS, Inc.*, 601 N.E.2d at 489; *First American Bank*, 781 S.W.2d at 591.

¶41. Here, WPH's objection was not to an aspect of the assignment which would put it in a less advantageous position than if there were no assignment. Instead, WPH is seeking to have Rub-a-Dub enter into an entirely new lease; one in which Rub-a-Dub would assume liability which it has not assumed under the current lease. It is unreasonable for WPH to withhold consent simply because it is unhappy with the agreement previously negotiated. *Campbell*, 715 P.2d at 294.

¶42. I would affirm the judgment of the Chancellor that it was unreasonable for WPH to withhold consent to the assignment.

**SULLIVAN AND PITTMAN, P.JJ., JOIN THIS OPINION. McRAE, J., JOINS IN PART.**

McRAE, JUSTICE, DISSENTING:

¶43. Given our limited standard of review, I see no reason to reverse the Chancellor's ruling in this case that the withholding of consent was unreasonable. Therefore, I dissent.

¶44. The Plaintiffs in this case, Rub-A-Dub Car Wash, Inc. and Kent and Helen Langdon (Rub-A-Dub), owned a car wash. The land on which the car wash sat was owned by Harold W. Wright, Hugh G. Payne, and Curry Holland (WPH). Rub-A-Dub leased the land from WPH. The lease contained a provision that allowed Rub-A-Dub to assign the lease only with the written permission of WPH. Permission, however, could not be unreasonably withheld by WPH.

¶45. Rub-A-Dub entered into a contract to sell the car wash to a third party. The sale fell through when WPH refused to consent to an assignment of the land lease unless certain conditions were met. WPH were concerned with potential liability for any possible leaking of some underground gasoline storage tanks and would allow an assignment of the lease only if Rub-A-Dub or the buyers would assume all liability for

damages and/or clean-up necessitated by the condition of the tanks. The tanks had been added twenty years previously, not by Rub-A-Dub, but by a prior tenant who had placed them there without the landowners' permission but with the landowners' knowledge.

¶46. Not surprisingly, neither Rub-A-Dub nor the purchaser would agree to assume liability for the tanks and the sale fell through. Rub-A-Dub then sued WPH for unreasonably withholding consent to the assignment of the lease. WPH counterclaimed seeking damages for any clean up costs associated with the tanks.

¶47. The Chancellor found that WPH owned the tanks and and was liable for any damages caused by them since WPH enjoyed the benefit of ownership from 1973 until 1994. The Chancellor held that the condition placed by WPH on the assignment was unreasonable and awarded $50,000 in damages to Rub-A-Dub.

¶48. WPH appealed. The Mississippi Court of Appeals reversed, rendered in part and remanded in part holding that WPH had the right to require Rub-A-Dub to clean up the tanks as a condition to the lease assignment. The Court of Appeals found the condition was commercially reasonable.

¶49. Rub-A-Dub filed a petition for writ of certiorari, arguing that the Court of Appeals (1) improperly substituted its judgment for that of the Chancellor when it found the owners' condition on the assignment was reasonable and (2) went outside the record when it found that Rub-A-Dub aggravated the leakage problem.

¶50. A chancellor's decision is reviewed on appeal for abuse of discretion. ***Church of God of Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.***, 716 So.2d 200, 204 (Miss.1998). That is to say that a chancellor's findings of fact must be left untouched unless manifestly wrong or clearly erroneous. ***Snow Lake Shores Property Owners Corp. v. Smith***, 610 So.2d 357, 360 (Miss.1992). We must "affirm a chancellor on a question of fact unless upon review of the record we be left with the firm and definite view that a mistake has been made." ***Snow Lake***, 610 So.2d at 360 (quoting ***Rice Researchers, Inc. v. Hiter***, 512 So.2d 1259, 1264 (Miss.1987)).

¶51. The Chancellor below made the following findings, all of which are supported by substantial evidence: (1) the tanks were added twenty years ago by a prior tenant without WPH's consent but with WPH's knowledge, (2) prior leases provided that the leases could not be assigned without the consent of WPH which could not be unreasonably withheld, (3) WPH agreed to two prior assignments of leases including the assignment in 1990 to Rub-A-Dub at which time the tanks were leaking, (4) the tanks were not included in the sale of the car wash to Rub-A-Dub, although Rub-A-Dub used the tanks with the knowledge of WPH and (5) WPH conditioned their consent to the lease assignment on the agreement of Rub-A-Dub or the purchaser to assume liability for the leakage or pay for clean up.

¶52. Based on these facts, the Chancellor held that the condition imposed on the assignment was unreasonable[1] and, thus, that Rub-A-Dub was entitled to damages for the lost sale.

¶53. The Court of Appeals accepted the Chancellor's findings as facts but nonetheless reversed holding that the condition imposed by WPH was a reasonable one inasmuch as WPH were aware of a potential environmental hazard and had a right to take steps to require the tenant to correct the problem. WPH, the Court wrote, were not required to "stand idly by and suffer the continuation of, and possible aggravation of, a condition that damages his property when that condition is brought on by the activities of the lessee."

¶54. The standard of review, however, demands that the chancellor's findings be upheld unless clearly erroneous. The decision of whether the withholding of consent to an assignment of a lease is reasonable is a question of fact. *See, e.g.,* **Homa-Goff Interiors, Inc. v. Cowden**, 350 So.2d 1035, 1037-38 (Ala. 1977) (holding that there was a fact issue precluding summary judgment as to whether lessor acted reasonably in rejecting prospective sublessees); **Campbell v Westdahl**, 715 P.2d 288, 292 (Ariz.Ct.App. 1985) (sufficient evidence existed to support jury's finding that consent was withheld unreasonably); **Brigham Young Univ. v. Seman**, 672 P.2d 15, 18 (Mont. 1983) (finding that landlord's withholding of consent to proposed sublease was unreasonable was ultimate fact supported by evidence in record and was not clearly erroneous and, thus, must be upheld on appeal). Thus, the chancellor's determination in this case that the withholding of consent was unreasonable must be upheld on appeal unless that finding is manifestly in error.[2]

¶55. This Court's majority opinion, as well as that of the Court of Appeals, makes much of the fact that the Langdons (Rub-A-Dub) themselves testified that WPH's request that Rub-A-Dub or its purchaser assume liability for the tanks was not unreasonable. I agree with the Chancellor that the Langdons' testimony is not dispositive of the issue. First of all, the standard is one of **commercial** reasonableness. As Charles Langdon testified, it was certainly not unreasonable for someone "not to want to own those tanks or not to be responsible for them." This is not the same as opining that the withholding of consent was commercially reasonable. If the Langdons had truly felt that WPH's refusal to consent to the assignment was reasonable, they would not have filed their suit. Secondly, as the Chancellor points out, the Langdons were not sophisticated purveyors of real estate. A full reading of the Langdons' testimony demonstrates that they were willing to assume liability for any damage that may have occurred on their watch, just not for anything that occurred before or after.[3] WPH's condition for consenting to the assignment would have made Rub-A-Dub (or its purchaser) liable for leaks not necessarily of their making. The Langdons' testimony is clear that they did not think this was fair.

¶56. Because there is substantial evidence in the record to uphold the decision of the Chancellor, this Court is bound by its standard of review to affirm. The Chancellor did not find that Rub-A-Dub either created or aggravated the leakage. Thus, WPH's demand that Rub-A-Dub assume sole responsibility for clean up notwithstanding the fact that there was no proof that Rub-A-Dub was solely responsible for the leakage was unreasonable. By connecting the demand to clean up the property to the right of assignment, WPH forced Rub-A-Dub to either assume sole responsibility for an environmental problem not clearly of its making or lose the sale of its business. In essence, WPH wanted to deprive Rub-A-Dub of its day in court to prove that someone other than Rub-A-Dub should bear all or a part of the clean-up costs.

¶57. Indeed, the issue surrounding clean up of the tanks was a red herring inserted by WPH. WPH owned the tanks. WPH had consented to previous assignments of the lease, including that to Rub-A-Dub, without requiring the tenant to assume responsibility for cleanup of the tanks. These factors fully support the Chancellor's holding that the withholding of consent over the issue of the tanks was commercially unreasonable.

¶58. The Court of Appeals in this case has substituted its judgment for that of the Chancellor, and this Court compounds that error by substituting our judgment for that of both the Court of Appeals and the Chancellor. As I can find no justification for reversing the Chancellor's decision in this case, I dissent.

**PITTMAN, P.J., AND BANKS, J., JOIN THIS OPINION.**

1. WPH "should not, in equity, be allowed to use the request for their consent to an assignment as an opportunity to re-write the lease and thereby abdicate their responsibilities with regard to liability," the Chancellor wrote.

2. Furthermore, a restriction against assignments in that it acts as a restraint on alienation is not favored by the law and should be strictly construed against the lessor. See Annot., Agreement by Lessee With Third Person Permitting Use of the Property As Violation of Covenant In Lease Against Assignment or Subletting, 89 A.L.R. 1325 (1934) ; *Buckeye Dev. Co. v. Feingold*, 626 S.W.2d 456, 458 (Mo.Ct.App. 1981); *Borgen v. Wiglesworth*, 375 P.2d 601, 604 (Kan. 1962).

3. As Helen Langdon points out, the EPA requires constant monitoring of the underground tanks. A service station cannot be operated unless it is in compliance with EPA guidelines. Because the tanks were monitored, the Langdons appear to be confident that no leaks occurred while they were in possession.